# STATE OF MICHIGAN

# COURT OF APPEALS

OSCAR GOODWIN,

        Plaintiff-Appellant,

v

CITY OF DETROIT and GREGORY TURNER,

        Defendants-Appellees,

and

STEVEN LEE, MELVIN HUGHES, BRIAN
FARKAS, KEVIN KORTAS, and JOHNA
EARLISHA JOHNSON,

        Defendants.

UNPUBLISHED
December 27, 2018

No. 341239
Wayne Circuit Court
LC No. 16-012815-CZ

Before: CAVANAGH, P.J., and SERVITTO and CAMERON, JJ.

PER CURIAM.

Plaintiff, Oscar Goodwin, appeals the trial court's final order entered on November 22, 2017. On appeal, plaintiff challenges the trial court's October 17, 2017 opinion and order denying plaintiff's motion for summary disposition pursuant to MCR 2.116(C)(8) and (C)(10), and granting defendant Gregory Turner's motion for summary disposition pursuant to MCR 2.116(I)(2). We affirm.

## I. FACTUAL BACKGROUND

On June 10, 2016, defendant Johna Johnson lost control of her vehicle and collided into the southwest corner of plaintiff's commercial building located in Detroit. Johnson told police officers that her car's brakes had failed, and in order to avoid rear-ending the vehicles in front of her, she swerved right and drove into the building. Paramedics, the Detroit Fire Department, and DTE Energy responded to the scene. Captain Steven Lee of the Detroit Fire Department was the commanding fireman on scene. According to Lee, he called Turner, Detroit's appointed Fire Marshal, and discussed the damage to the building. Lee expressed his concern about the structural integrity of the building and then sent pictures to Turner via text message. Turner ordered Lee to demolish the building. Within a few hours, Lee had contacted a demolition company and the building was demolished. That night, after the demolition of the building,

-1-

Turner sent a follow-up email to the building official, authorizing the building's demolition. Turner also signed a Notice of Emergency Demolition dated June 10, 2016. According to the notice, the demolition was ordered pursuant to MCL 29.7a(2) and Detroit City Ordinance, § 19-1-22, Chapter 1-4.5.

On October 7, 2016, plaintiff filed a complaint against the City of Detroit and John Doe, alleging statutory conversion, common-law conversion, gross negligence, violation of due process, negligence, and violation of Detroit Ordinances, § 9-1-45. On December 9, 2016, plaintiff filed a motion for leave to amend the complaint to add the individual defendants, and plaintiff was able to amend the complaint on January 30, 2017, to add Turner, Johnson, and Lee, as well as defendants Brian Farkas, Kevin Kortas, and Melvin Hughes. On February 24, 2017, the trial court dismissed the City of Detroit. On June 9, 2017, plaintiff filed a motion for partial summary disposition against Turner, claiming he was grossly negligent, liable for statutory and common-law conversion, violated plaintiff's due process rights, and violated city ordinances. Turner opposed the motion, arguing that all claims against him should be dismissed because he is entitled to governmental immunity, he was not grossly negligent, the conversion claims failed as a matter of law, a due process claim could not survive, and monetary damages were not available for a city official's violation of an ordinance.

On October 17, 2017, the trial court issued an opinion and order, denying plaintiff's motion for summary disposition under MCR 2.116(C)(8) and (C)(10), and granting Turner's request for summary disposition under MCR 2.116(I)(2).[1] After restating the governmental immunity standard for gross negligence and intentional torts, the trial court addressed each of plaintiff's claims. The trial court held that Turner was entitled to governmental immunity, that plaintiff failed to prove an intentional tort, and that the claims for a due process violation and a violation of the city ordinance also failed. On appeal, plaintiff argues that Turner is not entitled to governmental immunity because he did not act within the scope of his authority, and even if he did, his conduct was grossly negligent. Moreover, plaintiff claims that defendant is liable for conversion and violating plaintiff's constitutional right to due process.

## II. STANDARD OF REVIEW

This Court reviews rulings on a motion for summary disposition under MCR 2.116(C)(10) de novo. *Johnson v Recca*, 492 Mich 169, 173; 821 NW2d 520 (2012). Summary disposition is proper under MCR 2.116(C)(10) if "there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law." *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 469 (2003). In ruling on a motion under MCR 2.116(C)(10), a trial court may "consider the affidavits, pleadings, depositions, admissions, and other documentary evidence submitted by the parties in the light most favorable to the party opposing the motion." *Liparoto Const, Inc v Gen Shale Brick, Inc*, 284 Mich App 25, 29; 772 NW2d 801 (2009). "A genuine issue of material fact exists when the record, giving the benefit

---

[1] With the exception of the driver of the vehicle, plaintiff stipulated to the dismissal of the remaining defendants in the case, acknowledging that Turner was the official who ordered demolition of the building.

of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *West*, 469 Mich at 183.

This Court also reviews de novo a motion for summary disposition pursuant to MCR 2.116(C)(8) or (C)(7). *Trentadue v Buckler Automatic Lawn Sprinkler Co*, 479 Mich 378, 386; 738 NW2d 664 (2007). In reviewing a (C)(8) motion, this Court accepts as true all factual allegations in the claim "to determine whether the claim is so clearly unenforceable as a matter of law that no factual development could establish the claim and justify recovery." *Smith v Stolberg*, 231 Mich App 256, 258; 586 NW2d 103 (1998). "Under MCR 2.116(C)(7), the moving party is entitled to summary disposition if the plaintiff's claims are barred because of immunity granted by law[.]" *Odom v Wayne County*, 482 Mich 459, 466; 760 NW2d 217 (2008) (quotation marks and citation omitted). To survive a (C)(7) motion based on governmental immunity, "the plaintiff must allege facts justifying the application of an exception to governmental immunity." *Fane v Detroit Library Comm*, 465 Mich 68, 74; 631 NW2d 678 (2001). "The applicability of governmental immunity and its statutory exceptions are reviewed de novo," *Russell v City of Detroit*, 321 Mich App 628, 631; 909 NW2d 507 (2017), as are questions of statutory interpretation, *Rowland v Washtenaw Co Road Comm*, 477 Mich 197, 202; 731 NW2d 41 (2007).

III. ANALYSIS

A. GOVERNMENTAL IMMUNITY

Plaintiff argues the trial court erred when it dismissed his claims against Turner on the basis of governmental immunity. We disagree.

The Governmental Tort Liability Act (GTLA), MCL 691.1401 *et seq.*, grants immunity from tort liability for governmental employees acting within the course of employment, subject to limited enumerated exceptions. See MCL 691.1407(2). The test for individual governmental immunity is set forth in MCL 691.1407(2):

> (2) Except as otherwise provided in this section, and without regard to the discretionary or ministerial nature of the conduct in question, each officer and employee of a governmental agency . . . is immune from tort liability for an injury to a person or damage to property caused by the officer, employee, or member while in the course of employment or service . . . if all of the following are met:
>
> (a) The officer, employee, member, or volunteer is acting or reasonably believes he or she is acting within the scope of his or her authority.
>
> (b) The governmental agency is engaged in the exercise or discharge of a governmental function.
>
> (c) The officer's, employee's, member's, or volunteer's conduct does not amount to gross negligence that is the proximate cause of the injury or damage. [MCL 691.1407(2)(a), (2)(b), and (2)(c).]

"Gross negligence" is defined as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." MCL 691.1407(8)(a).

In this case, Turner is immune from tort liability if he was acting in the course of his employment, and (1) he acted or reasonably believed he was acting within the scope of his authority, (2) the agency he works under—the fire department—was engaged in the exercise or discharge of a governmental function, and (3) his conduct did not amount to gross negligence, i.e., conduct so reckless it demonstrates a substantial lack of concern for whether an injury results.

The first question at issue is whether Turner was acting while in the course of his employment. MCL 691.1407(2). "[A]bsent a finding of 'course of employment,' a court would have no need to reach MCL 691.1407(2)(a)." *Niederhouse v Palmerton*, 300 Mich App 625, 633; 836 NW2d 176 (2013). "The necessary considerations for a course of employment are (1) the existence of an employment relationship, (2) the circumstances of the work environment created by the employment relationship, including the 'temporal and spatial boundaries established,' and (3) 'the notion that the act in question was undertaken in furtherance of the employer's purpose.' " *Id*. (citations omitted).

There is no dispute that Turner is the fire marshal for the City of Detroit and therefore an employee of the Detroit Fire Department. In that role, Turner's duties include the inspection of buildings and other places necessary to enforce the City's fire prevention ordinances. See Detroit Charter, art VII, ch V, § 7-504. This necessarily includes issuing orders for the abatement of hazardous conditions in violation of the City's ordinances. See Detroit Ordinances, § 19-1-22, ch 1-4.5; see also MCL 29.7a (granting authority to abate emergency conditions dangerous to persons or property). Lastly, Turner's actions were clearly in furtherance of the fire department's purpose—to protect life and property from fire and other dangerous conditions. See Detroit Charter, art VII, ch V, § 7-503 (providing that "[t]he Fire Department shall protect life and property from fire and other dangerous conditions requiring their expertise . . .").

Upon finding that the governmental actor proceeded while in the course of employment, the question turns on whether Turner was acting within the scope of his authority in pursuit of a governmental function. Plaintiff first argues that Turner did not act, and could not have reasonably believed he was acting, within the scope of his authority as the fire marshal because the relevant ordinance and statute did not grant Turner the authority to demolish the building at issue. This argument fails.

MCL 691.1401(b) defines "[g]overnmental function" as "an activity that is expressly or impliedly mandated or authorized by constitution, statute, local charter or ordinance, or other law." According to plaintiff, Turner was not acting in the scope of his authority because neither Detroit Ordinances, § 19-11-22, nor MCL 29.7a, granted him the authority to order the demolition of plaintiff's building. Therefore, Turner could not have acted within the scope of his authority.

Arguably, the relevant provision under Detroit's ordinance would not have vested Turner, as fire marshal, with the authority to demolish plaintiff's building. Under Detroit's ordinance, the Detroit Fire Marshal has the following power: "Where conditions exist, and are deemed

-4-

hazardous to life and property by the authority having jurisdiction, the authority having jurisdiction shall have the authority under his or her police powers to summarily abate such hazardous conditions that are in violation of this Code at the expense of the responsible party." Detroit Ordinances, § 19-11-22, ch 1-4.5. The term "summarily abate" is further defined as "[t]o immediately judge a condition to be a fire hazard to life or property and to order immediate correction of such condition." Detroit Ordinances, § 19-11-22, ch 2-1.160. And a "fire hazard" is "[a]ny situation, process, material, or condition that, on the basis of applicable data, may cause a fire or explosion or provide a ready fuel supply to augment the spread or intensity of the fire or explosion and that poses a threat to life or property." Detroit Ordinances, § 19-11-22, ch 2-1.65. In this case, plaintiff's building may have posed a threat of collapse, but there is no evidence the building was a "fire hazard" that the fire marshal could "summarily abate" under the applicable ordinance.

With that said, Turner had the power to demolish plaintiff's building under MCL 29.7a. Under MCL 29.7a(1) and (2):

> (1) If the state fire marshal or the commanding officer of the fire department of a city, village, township, or county, or a fire fighter in uniform acting under the orders and directions of the commanding officer determines a dangerous condition exists, the state fire marshal, the commanding officer of the fire department of a city, village, township, or county, or the fire fighter in uniform acting under the orders and direction of the commanding officer upon finding an emergency condition dangerous to persons or property, may take all necessary steps and prescribe all necessary restrictions and requirements to protect persons and property until the dangerous condition is abated.
>
> (2) The state fire marshal, the commanding officer of the fire department of a city, village, township, or county, or a fire fighter in uniform acting under the orders and directions of the commanding officer, responding to a fire or emergency call, who, upon arriving at the scene of a fire or emergency, finds a condition dangerous to persons or property, may take all necessary steps and requirements to protect persons and property until the dangerous condition is abated.

Plaintiff argues that Turner, as Detroit's appointed fire marshal, was not "the commanding officer of the fire department."

"A court does not construe the meaning of statutory terms in a vacuum." *South Dearborn Environmental Improvement Association, Inc v Dep't of Environmental Quality*, 502 Mich 349, 376; 917 NW2d 603 (2018) (quotation marks and citation omitted). Instead, terms are reviewed in context, "with a view to their place in the overall statutory scheme," and "such words or phrases used . . . must be assigned such meanings as are in harmony with the whole of the statute, construed in the light of history and common sense." *Id*. (quotation marks and citations omitted).

Unfortunately, the Fire Prevention Code, MCL 29.1 *et seq.*, does not define "commanding officer." The central word at issue is "commanding," and to "command" means

"to direct authoritatively" or "to overlook or dominate from or as if from a strategic position." *Merriam-Webster's Collegiate Dictionary* (11th ed). With that said, the Fire Prevention Code does define a "fire chief" as "the chief operating officer of an organized fire department," MCL 29.1(p), which is a far more specific role in the fire department. A "commanding officer" in contrast is a broader role than the person acting as "chief operating officer" of the fire department, who is often the person occupying the highest position of authority.

Indeed, a commanding officer of a city fire department may certainly hold a different title than the commanding officer of a village or township fire department. The pertinent question turns on who, as commanding officer, would have the authority to make the requisite inspections and determinations necessary under MCL 29.7a. The Detroit City Charter states that "[t]he Fire Department is headed by the Fire Commissioner." Detroit Charter, art VII, ch V, § 7-501. The fire chief and the fire marshal are appointed by the fire commissioner and lead divisions of the fire department. Detroit Charter, art VII, ch V, § 7-502. According to the city charter, the fire chief serves "as the Director of Operations for the Fire Fighting Division." *Id*. On the other hand, "[t]he Fire Marshal shall inquire into the origin of all fires resulting in property loss and shall make a written report concerning every such fire to the Fire Commissioner" and "shall also make such inspection of buildings and other places as is necessary for enforcement of the fire prevention ordinances of the City." Detroit Charter, art VII, ch V, § 7-504. Thus, the Detroit Charter clearly designates the fire commissioner as the head of the Detroit Fire Department, the fire chief as the head of the Fire Fighting Division, and the fire marshal as the head of the fire department's investigations, which includes investigating buildings that pose a danger to the public.

At first glance, it would appear that "the commanding officer" of the Detroit Fire Department is the fire commissioner, who is appointed by the mayor. Detroit Charter, art VII, ch V, § 7-501. However, to suggest that the fire commissioner would be the only "commanding officer of the fire department" for purposes of MCL 29.7a is impracticable. This provision should not be read in a vacuum; rather it must be interpreted in light of the entire statutory scheme and in light of history and common sense. *South Dearborn*, 502 Mich at 376. In pertinent part, MCL 29.7a(1) states that the commanding officer of the fire department of a city, "upon finding an emergency condition dangerous to persons or property," may abate the dangerous condition. Similarly, MCL 29.7a(2) states that the commanding officer, "upon arriving at the scene of a fire or emergency," may abate the dangerous condition. To suggest that, in the context of this case, the Detroit Fire Commissioner—an appointee of the mayor—is the only "commanding officer" envisioned under the statute is inconsistent with the statutory language. The statute suggests that the person involved with directing the response to emergencies and overseeing the inspection of the premises is not necessarily the highest appointed official in the department—rather it would be the person in the highest position responsible for issuing the commands necessary to control the situation, i.e., the officer "finding an emergency condition" or "arriving at the scene of a fire or emergency." The Fire

Commissioner delegates his or her authority for the efficient administration of the fire department, and the statutory language takes such delegations into consideration.[2]

Importantly, the Detroit Fire Commissioner appoints the fire chief and fire marshal to lead the two divisions of the Detroit Fire department. Turner is expressly in charge of all investigations of buildings and other places for purposes of enforcing the fire prevention ordinances of the City of Detroit. Turner testified that he had ordered approximately 50 emergency demolitions under the authority of MCL 29.7a alone since his appointment to the position. MCL 29.7a grants authority not only to the commanding officer, but "a fire fighter in uniform acting under the orders and direction of the commanding officer." If the Fire Commissioner would not be responding to the scene of an emergency, he or she would certainly not be the officer in charge of commanding fire fighters at the scene. Instead, the most logical decision makers would be the fire chief or fire marshal or those officers under their command. On closer reading of the provisions under MCL 29.7a, Turner was the commanding officer for purposes of ordering the abatement of the dangerous condition at issue in this case. Turner had the authority to "take all necessary steps and requirements to protect persons and property until the dangerous condition is abated." Therefore, Turner acted in the scope of his authority when he ordered the demolition of the building, as he had done concerning numerous buildings before.

Even if the Fire Prevention Code does not grant Turner express authority to abate the hazard at issue in this case, he reasonably believed he had such authority. Under MCL 691.1407(2)(a), immunity is afforded to a governmental employee who "reasonably believes he or she is acting within the scope of his or her authority." Turner reasonably believed that he was the "commanding officer" in charge of the fire department at issue, given that he was appointed by and served at the pleasure of the Fire Commissioner. See Detroit Charter, art VII, ch V, § 7-502. Moreover, Turner's responsibility as the fire marshal was to "make such inspection of buildings and other places as is necessary." Detroit Charter, art VII, ch V, § 7-504. This is clearly evidenced by the fact that he had ordered the abatement of approximately 50 other buildings since he was appointed to the position. Therefore, the trial court did not err when it concluded that Turner acted within the scope of his authority.

The next element for individual immunity is whether the agency, i.e., the fire department, had been engaged in a governmental function. As elaborated above, the fire department has the authority to inspect and determine whether a building qualifies as a dangerous building requiring immediate abatement. Therefore, this element has been established.

Finally, the analysis turns on whether Turner's actions in ordering demolition of the building constituted gross negligence. Plaintiff argues that, even if Turner has the authority to order demolition of dangerous buildings, doing so in this case involved "conduct so reckless as

_____

[2] If a fire marshal of a city was responding to a building full of highly flammable materials posing an immediate threat to all persons in the near vicinity, it would be unreasonable to require such a fire marshal to seek approval from the head of the fire department before taking any necessary steps to abate the hazardous condition.

to demonstrate a substantial lack of concern for whether an injury results." MCL 691.1407(8)(a). We disagree.

Captain Lee responded to the accident. Lee, who was under the command of Turner, believed the condition of plaintiff's building was hazardous to the public, and he contacted Turner by phone to describe its condition and the dangers he believed it posed. Lee then sent pictures to Turner of the damaged building. Based on that information, Turner ordered demolition of the building to protect the public from dangers associated with its possible collapse. Even if we were to conclude that Turner's decision-making constituted ordinary negligence, it was not so reckless as to demonstrate a substantial lack of concern for whether an injury results. Turner's concern was the safety of the public. On reviewing the photographs and speaking with Lee, Turner was concerned that the corner of plaintiff's building had a high risk of collapse and was therefore dangerous to the public. Given these considerations and the deliberate decision-making on the part of the Fire Marshal, Turner's conduct was not so reckless as to constitute gross negligence.

Plaintiff contends that his building should have been inspected by a qualified structural engineer, and because Turner was not so credentialed, his actions were grossly negligent. However, plaintiff has not provided any support in the law that requires such an inspection under emergency circumstances where the building poses a danger to the public. Instead, plaintiff cites two cases, *Oxenrider v Gvoic*, 340 Mich 591; 66 NW2d 80 (1954) and *Orion Charter Twp v Burnac Corp*, 171 Mich App 450; 431 NW2d 225 (1988), for the proposition that a structural engineer should have first inspected the building before ordering demolition. However, the issue in those cases turned on whether building officials properly ordered demolition of buildings that constituted a nuisance. Those cases did not involve the fire department responding to an emergency situation, specifically one where a car drove into a building. Therefore, those cases are inapplicable to the facts in this case and plaintiff's arguments are without merit.

## B. CONVERSION CLAIMS

Plaintiff also argues that Turner is liable on statutory and common-law conversion theories. We disagree.

Under MCL 691.1407(3) of the GTLA, governmental employees may be granted immunity from intentional-tort liability under certain circumstances. *Odom*, 482 Mich at 461. If the plaintiff pleaded an intentional tort, the question is whether the defendant established that he is entitled to individual governmental immunity by showing the following:

(a) The acts were undertaken during the course of employment and the employee was acting, or reasonably believed that he was acting, within the scope of his authority,

(b) the acts were undertaken in good faith, or were not undertaken with malice, and

(c) the acts were discretionary, as opposed to ministerial. [*Id*. at 479-480.]

In this case and as stated previously, Turner was acting in the course of his employment, within the scope of his authority, and his actions did not constitute gross negligence, let alone malice or bad faith. The last requirement is determining whether the actions were discretionary rather than ministerial. Clearly, determining whether a building is so dangerous that it necessitates demolition is a discretionary act falling within the parameters of the governmental-immunity test for intentional torts.

Regardless of whether Turner is afforded immunity for his actions, plaintiff failed to show the requisite criteria for a conversion claim. To prove statutory conversion, plaintiff had to show that Turner converted the property "to [his] own use." *Aroma Wines & Equip, Inc v Columbian Distrib Servs, Inc*, 497 Mich 337, 357-359; 871 NW2d 136 (2015). In no way did Turner order demolition of the building as a way to convert the property to his own use. Plaintiff's common-law conversion claim also fails. Common-law conversion occurs when "a party properly in possession of property uses it in an improper way, for an improper purpose, or by delivering it without authorization to a third party." *Dep't of Agriculture v Appletree Marketing, LLC*, 485 Mich 1, 14; 779 NW2d 237 (2010). As discussed above, Turner's actions were not improper, and therefore, he cannot be responsible on a conversion theory.

## C. DUE PROCESS CLAIM

Finally, plaintiff claims a violation of due process because Turner failed to provide proper notice before ordering demolition of plaintiff's building. We disagree.

"As a general rule, 'governmental immunity is not available in a state court action where it is alleged that the state violated a right conferred by the state constitution.' " *LM v State*, 307 Mich App 685, 694; 862 NW2d 246 (2014), quoting *Jones v Powell*, 227 Mich App 662, 673; 577 NW2d 130 (1998), aff'd 462 Mich 329 (2000). However, "our Supreme Court has clearly held that no inferred damages remedy for a violation of a state constitutional right exists against individual government employees." *Lavey v Mills*, 248 Mich App 244, 250; 639 NW2d 261 (2001), citing *Jones v Powell*, 462 Mich 329, 335; 612 NW2d 423 (2000). As the trial court correctly held, plaintiff's due process claim cannot succeed for it fails to state a claim upon which relief can be granted.

Affirmed.

/s/ Mark J. Cavanagh
/s/ Deborah A. Servitto
/s/ Thomas C. Cameron